**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

|  |  |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>      Plaintiff,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>      Defendant. | Case No.: 2:26-cv-400<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

1.      Plaintiff Massachusetts Institute of Technology ("MIT") hereby brings this action alleging that Defendant Microsoft Corporation ("Microsoft") has infringed United States Patent Nos. 7,818,569 (the "'569 Patent") and 7,681,103 (the "'103 Patent") (collectively, the "Asserted Patents") in violation of the patent laws of the United States of America, 35 U.S.C. § 1 et seq.

## THE PARTIES

2.      Plaintiff Massachusetts Institute of Technology ("MIT"), a Massachusetts nonprofit corporation, is a private research and educational institution located at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139.

3.      Defendant Microsoft is a Washington corporation with its principal place of business located at 1 Microsoft Way, Redmond, Washington 98052. Microsoft does business throughout the United States, including in this District.

## JURISDICTION AND VENUE

4.      This is a civil action for patent infringement arising under the patent laws of the United States as set forth in 35 U.S.C. §§ 271, *et seq*.

5.      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Microsoft because Microsoft maintains offices, data centers and point of presence locations in this District, has engaged in systematic and continuous business activities in this District, and, on information and belief, has committed acts of infringement within this District.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b) because Microsoft has regular and established places of business in this District, and, on information and belief, has committed acts of infringement within this District.

8.      Microsoft maintains business and personal property in this district in at least Collins and Denton counties.[1]

9.      Microsoft also operates Microsoft Windows Stores within Best Buy retail locations in this District, such as at 2800 N Central Expressway, Plano and 3333 Preston Road, Suite 200, Frisco.

10.     Microsoft also maintains a "point of presence" location in this District in Plano. Microsoft states that "Azure Front Door has edge locations or points of presence (PoPs) worldwide. Every Front Door PoP can serve traffic for any request."[2] These point of presence locations constitute a regular and established physical presence in the District.  Microsoft has maintained at least one point of presence location in this District since at least as early as March 31, 2025.

---

[1] https://esearch.collincad.org/search/result?keywords=OwnerName%3A%22microsoft%20corporation%22%20Year%3A2026%20&searchSessionToken=gL9Uwnao6Q9XrC5cidl%2B0bbhhS%2BXGBWiHE2YuHLKIiA%3D%7C2026-04-02T18%3A45%3A14.7810894Z; https://www.dentoncad.com/property-search.
[2] https://learn.microsoft.com/en-us/azure/frontdoor/front-door-traffic-acceleration?pivots=front-door-standard-premium.

11. Microsoft has committed acts of infringement because Microsoft has used technology that performs actions that infringe on claims 1-12 of the '569 Patent and claims 1-11, 20 and 22-26 of the '103 Patent. On information and belief, at least some of these acts of infringement were performed in this District.

## MIT'S GROUNDBREAKING DEVELOPMENT OF PHYSICAL UNCLONABLE FUNCTION TECHNOLOGY

12. MIT is a research and educational institution dedicated to making a better world through education, research and innovation.  Founded to accelerate the nation's industrial revolution, MIT has led the advancement of knowledge and education of students in science, technology, and other areas of scholarship in the United States and the world. MIT graduates have invented fundamental technologies, launched new industries, and created millions of American jobs.  For more than 150 years, the Institute has married teaching with engineering and scientific studies—and produced a stream of world-changing advancements.

13. In 2002, MIT tenured Professor Srinivas Devadas and his co-authors published a paper entitled "Silicon Physical Random Functions" (November 2002). This groundbreaking paper has been cited over 1,300 times and has been widely recognized as the first implementation of a physical unclonable function ("PUF") in a computer chip.[3] Professor Devadas is the Webster Professor of Electrical Engineering and Computer Science at MIT and has been on the faculty since 1988.

14. At the time that Professor Devadas and his team performed the work that resulted in the Asserted Patents, PUF technology had only recently been identified as a potentially useful

---

[3] *See* https://people.csail.mit.edu/devadas/pubs/spuf.pdf;
https://spqrlab1.github.io/papers/holcomb_PUFs_date14.pdf.

technology.  Professor Devadas and his team recognized that leveraging PUF technology could have potential benefits in the fields of authentication and cryptography.

15.    A PUF is a physical object that provides a unique, "unclonable" value specific to that device that is determined from variations that arise during the manufacturing process of a device. As developed by Professor Devadas and his team, PUF technology exploits these variations by using them to authenticate and uniquely identify the device, rather than using a separate security code that must be stored in non-volatile memory and is therefore vulnerable to attack (e.g., to hacking, cloning and/or deletion). Because the digital value is not evident from examining the chip, and requires applying the device-specific function, this approach results in a more secure chip that is resistant to physical tampering.

16.    However, as identified by Professor Devadas and explained in the Asserted Patents, the unique output from a PUF can vary due to various factors, such as measurement error, changes in environmental conditions or the effects of circuit aging, and thus did not always reliably generate the same value every time.[4] A PUF value has little to no practical use for cryptography if the same unique value is not generated every time.

17.    Among the challenges that Professor Devadas and his team faced, which had not been resolved at the time of the Asserted Patents, was to figure out how to repeatedly generate a device-specific value on a computer chip that: (1) was physically secure and resistant to tampering; (2) would not take up significant additional space on the computer chip or require modifying the manufacturing process for the computer chip; and (3) would result in the reliable regeneration of that same value without exposing it, such that it could be used for cryptographical applications.

---

[4] *See* '103 Patent at 7:58-60.  The '103 Patent and '569 Patent share a common specification, so this document cites only to the '103 Patent.

18.     The Asserted Patents disclose one prior art method that attempted to generate the same digital value was to mitigate the effects of measurement errors by taking only a specific type of measurement that was resistant to those measurement errors, such as a ratio of oscillator counts.[5] Other solutions in the prior art included:

- Thresholding, *i.e.*, measuring whether certain outputs meet a certain threshold instead of the absolute value of an output.

- Quantization, *i.e.*, mapping high-precision values to a smaller set of discrete, low-precision values.

- Increasing entropy so that the fabrication differences between like devices is large. While this does not generate the same signal every time, it potentially could be combined with the above techniques to make them more reliable.

- Generating digital values in conditions (*e.g.*, very low temperature) where measurement variations are limited or eliminated.

19.     However, these solutions all had drawbacks, such as not being effective in all instances, or having burdensome implementation requirements.

20.     The '103 Patent represents the first disclosure of a novel method of repeatedly generating the same unique signal as a PUF value. It achieved that goal in part by an unconventional application of an error correction framework comprising a specific ordered combination of steps. This novel framework eliminated the drawbacks of previous methods.

21.     By pairing a unique and unconventional error correction framework with the nascent PUF technology, Professor Devadas and his team developed a unique and unconventional

---

[5] *See*, *e.g.*, '103 Patent at 10:49-52.

combination of steps that allows for the reliable and secure regeneration of a computer chip-specific value.

22.    Being able to reliably generate the same cryptographic key is essential for cryptography. Thus, the reliable and secure regeneration of chip-specific values, as developed by Professor Devadas and his team, opened the door for PUF technology to be applied to cryptographic functions.

23.    The inventions disclosed in the Asserted Patents ultimately led to the first PUF chip, which to this day is proudly displayed outside Professor Devadas' MIT office:



## THE ASSERTED PATENTS

24.    MIT is the assignee and owns all right, title and interest in the '103 Patent and the '569 Patent, including the right to sue for past infringements thereof.

25.    The '103 Patent, which is entitled "Reliable generation of a device-specific value," was duly and legally issued to inventors Srinivas Devadas and Blaise Gassend, with MIT as the assignee, on March 16, 2010.  A true copy of the '103 Patent is attached hereto as **Exhibit A**.

26.    Claim 1 of the '103 Patent is reproduced below:

A method for repeatedly generating an unpredictable device-specific value comprising:

in a first component of a device, generating a first digital value that is substantially dependent on fabrication variation among like devices, wherein the first digital value comprises a device-specific function of an input value inputted to a device;

computing redundancy information based on the first digital value;

in the first component of the device, generating a subsequent digital value; and

in a second component of the device, determining the first digital value from the subsequent digital value and the redundancy information.

27.    As stated in the preamble, claim 1 of the '103 Patent covers a method for repeatedly generating a specific value. The '103 Patent's specific method for repeatedly generating this value involves generating a first digital value by applying a function that is substantially dependent on fabrication variations to an input value, then computing redundancy information during the enrollment phase, then generating a second value by applying a function that is substantially dependent on fabrication variations to an input value, and finally applying the redundancy information to the second generated value to regenerate the first value.

28.    The '103 Patent's specific method of reliably generating a device-specific value was not a routine or conventional use of an integrated circuit or any other type of device. As discussed above, PUF technology itself was nascent at the time of the conception of the Asserted Patents, thus the idea of using fabrication variations to generate unique values was itself not routine or conventional.  Further, the solution claimed in the '103 Patent requires that the first digital signal be generated based on a function that is dependent on fabrication variations ***and an input value***, which allows different digital signals to be generated and selected from the same device by using different input values. This adds an additional layer of security because, even if one possesses a particular device, one must also know the original input value to selectively regenerate the first

7

signal. The ability to generate a digital value by inputting an input to a device, then applying a device-specific function based on fabrication variations among like devices, was not routine or conventional.

29. The application of the PUF technology, as claimed in the '103 Patent, when combined with the error correction framework disclosed in those claims, also was not routine or conventional. It is the totality of the elements of the claims that, when combined, allow for the reliable regeneration of device-specific values.  In the conventional approach to error correction, a source wants to transmit a signal "X," so it computes redundancy information "R," and transmits some combination of X and R (*e.g.*, X‖R). At the receiver, a different combination of X and R is received (*e.g.*, X'‖R'), such that X' may not equal X and/or R' may not equal R. However, there is enough information in X'‖R' to reconstruct X (subject to limits on the degree to which X'‖R' is not X‖R).

30. Unlike this conventional approach, the '103 Patent generates an unconventional first digital value "X" based on fabrication variations and an input value, as set forth in the first element of the claim, and thereafter generates redundancy information from the first digital value "R." The redundancy information R is stored.  Later, a subsequent digital value "X'" is generated. Using the redundancy information R, the combination of X' and R allows the device to regenerate the first digital value X from the subsequent digital value X'.  Rather than generating redundancy information each time a device-specific value is generated, the redundancy information is generated once and used to correct subsequent digital values back to the first digital value.  In this manner, each of the claim elements of the '103 Patent claims, when practiced in combination and in the order set forth in the claims, constitutes a unique and unconventional approach that enables

the reliable and secure regeneration of a device-specific value from fabrication variations of the device without exposing or storing the device-specific value.

31.     Prior to the invention of the '103 Patent, no one had thought to apply the unique error correction framework described in that patent's claims to the PUF technology approach set forth in the claims to generate digital signals.  The result was that, for the first time, digital signals could be generated that: (1) were physically secure and resistant to tampering; (2) would not take up significant additional space on the computer chip or require modifying the manufacturing process for the computer chip; and (3) would result in the reliable regeneration of that same value such that it could be used for cryptographical applications. The '103 Patent thus represents an inventive pairing of a unique and unconventional approach to error correction with a unique and unconventional way of generating a digital signal.

32.     The '103 Patent provides a specific technological improvement to PUF technology because it provides a technological solution to a fundamentally technological problem. As discussed above, the '103 Patent is solving a problem caused by the hardware itself, such as, *inter alia*, measurement errors, changes to the hardware caused by environmental conditions, and the effects of circuit aging.  Those factors did not allow for a repeatably generated PUF value, which was a critical requirement for PUF technology to have any utility for cryptography. By its nature, this problem was inherently rooted in PUF technology itself, the hardware in which the PUF technology is inextricably linked, and the environmental conditions in which the PUF technology and hardware operate. As such, the solution described in the claims of the '103 Patent is a specific technological improvement to PUF technology that has no non-technological analog.

33.     The '569 Patent, which is entitled "Data protection and cryptographic functions using a device-specific value," was duly and legally issued to inventors Srinivas Devadas and

9

Blaise Gassend, with MIT as the assignee, on October 19, 2010.  A true copy of the '569 Patent is attached hereto as **Exhibit B**.

34.    Claim 9 of the '569 Patent is reproduced below:

A method comprising:

applying a key generation function to determine a cryptographic key in an integrated circuit based on an input to the key generation function that includes a first digital value generated in the integrated circuit such that the first digital value depends on circuit parameters that vary due to fabrication variations among like integrated circuits; and

performing a cryptographic function on information stored in the integrated circuit using the determined cryptographic key;

wherein the method does not require non-volatile storage of the cryptographic key in the integrated circuit.

35.    Claim 9 of the '569 Patent covers a method that generates a first digital value based on an input value and circuit parameters that vary due to fabrication variations in integrated circuits, applies a key generation function to that first digital value to derive a cryptographic key, and performs a cryptographic function on information stored in the integrated circuit. This method does not require non-volatile storage of the cryptographic key in the integrated circuit because the cryptographic key can be generated as needed.

36.    The '569 Patent builds upon the invention claimed in the '103 Patent.  In particular, foundationally, the claims again require using PUF technology that is inextricably linked to the challenges associated with the hardware itself, and as such has no non-technical analogue. The claims require, for example, that the digital value/cryptographic key is not stored on the integrated circuit. If the digital value is not stored, it must be regenerated each time it is needed, which requires reliable generation of the digital value/cryptographic key despite measurement errors, environmental conditions or the effects of circuit aging.

37.     The particular method of performing a data access function, as disclosed in claim 1 of the '569 Patent, was not a routine or conventional use of an integrated circuit. As discussed above, because PUF technology was nascent at the time, it was not routine or conventional to use an integrated circuit to generate or regenerate a particular digital value by applying a function that is substantially dependent on fabrication variations. Further, unlike then-existing approaches, the '569 Patent performs a data access function on information stored in the *same* integrated circuit used to generate the device-specific value, all without storing the digital value. By generating the digital value using a PUF, not transmitting the digital value outside the chip (by using it to perform a cryptographic/data access function on information stored on the chip), *and* not storing the digital value on the chip, the '569 Patent eliminated the vulnerability of storing the digital value on or off the chip, where it could be extracted from the chip after injection or intercepted during transmission, respectively.

38.     The particular method of performing a cryptographic function, as disclosed in the claim 9 of the '569 Patent, also was not a routine or conventional use of an integrated circuit. Existing cryptographic systems at the time required the injection of a cryptographic key into an integrated circuit.  This required an entity to create and disperse cryptographic keys to computer chips, making them vulnerable to interception during transmission.  This presented significant security vulnerabilities with the management and delivery of secret keys to integrated circuits.  The solution claimed in the '569 Patent requires that a cryptographic key be generated based on a function that is dependent on fabrication variations. The ability to generate a cryptographic key using a device-specific function based on fabrication variations among like devices was not routine or conventional.

39.      Further, unlike existing approaches, the '569 Patent performs a cryptographic function on information stored in the *same* integrated circuit used to generate the device-specific value, all without storing the cryptographic key. By generating the key using a PUF, not transmitting the key outside the chip (by using it to perform a cryptographic/data access function on information stored on the chip), *and* not storing the key on the chip either, the '569 Patent makes it almost impossible for hackers to discern the identity of the key and never exposes the key outside of the integrated circuit.  These features not only allow PUF technology to be used with cryptography, but improve cryptographic systems by removing the conventional requirement of generating and injecting secret cryptographic keys into a chip.  The '569 Patent generates a secure cryptographic key *within* the chip in a manner that never exposes the cryptographic key outside of the chip and without requiring storage of the cryptographic key within the chip, eliminating the possibility that the key can be extracted from the chip after injection or intercepted during transmission. As such, the '569 Patent enables performance of cryptographic functions on information stored in the circuit.  This was not possible using conventional cryptographic techniques at the time of the '569 Patent.

## THE WIDESPREAD RECOGNITION AND ADOPTION OF PROFESSOR DEVADAS' PUF TECHNOLOGY

40.      Professor Devadas' groundbreaking work on PUF technology, which formed the basis for the inventions disclosed in the Asserted Patents, has been lauded throughout the industry in numerous ways. Professor Devadas and his co-authors were awarded the 2015 A. Richard Newton Technical Impact Award for their work, which honors individuals for their outstanding technical contribution within the field of electronic design automation.[6] He and his co-authors also

---

[6] https://sigda.org/archive/node/44.html.

won the 2002 Annual Computer Security Applications Conference Outstanding Student Paper award for a companion paper on their work.[7]

41.    Further, as the influence of the inventions on the security industry has grown over the years, Professor Devadas has garnered more and more recognition for his groundbreaking work as disclosed in the Asserted Patents, including, for example, the following:

- Professor Devadas won the 2014 IEEE Computer Society's Technical Achievement Award "for pioneering work in secure hardware, including the invention of Physical Unclonable Functions and single-chip secure processor architectures."[8]

- Professor Devadas won the 2017 IEEE Computer Society's Wallace McDowell Award "for fundamental contributions that have shaped the field of secure hardware, impacting circuits, microprocessors, and systems" based on his work on PUF technology.[9]

- Professor Devadas won the 2018 IEEE Circuits & Systems Society's Charles A. Desoer Technical Achievement Award "for the development of PUFs and enabling the deployment of secure circuits, processors and systems."[10]

- Professor Devadas won the 2021 IEEE Cybersecurity Award for Practice "for developing Physical Unclonable Functions for Device Authentication."[11]

---

[7] https://www.acsac.org/archive/.
[8] https://www.computer.org/press-room/news-archive/2014-technical-achievement.
[9] https://www.computer.org/press-room/2017-news/mcdowell-award-2017.
[10] https://ieee-cas.org/society-achievement-award-recipients-list; https://podcasts.apple.com/ci/podcast/world-leaders-in-cryptography-srini-devadas/id1617044319?i=1000706857726.
[11] https://secdev.ieee.org/2021/ieee-award-ceremony/.

- Professor Devadas won the 2021 ACM SIGSAC Outstanding Innovation Award "for fundamental contributions to the development of secure microprocessors, circuits, and systems," again based on his work with PUF technology.[12]

42.    The '103 Patent has been cited in approximately 215 subsequent applications and the '569 Patent has been cited over 80 times.

43.    In fact, Professor Devadas' invention has only grown in importance over time. Specifically, the emergence and rapid growth of the Internet of Things – the network of physical objects exchanging data over the internet – has led to increasing demand for the kind of robust authentication offered by the inventions claimed in the Asserted Patents.[13]

44.    This demand has, in turn, led to the widespread adoption of Professor Devadas' specific method of reliably generating a unique signal based on fabrication variations, due to its ability to provide robust, cost-effective authentication, and reliable key generation.[14]

45.    By 2022, PUF technology had become "an essential component for strengthening the security of Internet of Things (IoT) edge devices,"[15] and had been incorporated into various technical standards from the International Organization for Standardization. For instance, ISO/IEC 20897-1, which was first published in 2020, specifies certain security requirements for cryptographic modules that use PUFs.[16] ISO/IEC 20897-2, another standard first published in 2022, specifies certain test and evaluation methods for PUFs.

46.    Companies that have taken a license to the Asserted Patents include Intel, a major chip manufacturer, and Xilinx, a provider of PUF technology.

---

[12] https://www.sigsac.org/ccs/CCS2021/sigsac-awards.html.
[13] https://www.eetimes.com/what-is-puf-technology-and-how-is-it-helping-secure-the-internet-of-things/.
[14] *Id.*
[15] https://www.frontiersin.org/journals/sensors/articles/10.3389/fsens.2021.751748/full.
[16] https://www.iso.org/standard/76353.html.

47.     Intrinsic ID, Inc. ("Intrinsic ID") is a company that has been a leader in the sale of PUF technology and was ultimately purchased by Synopsys, Inc. ("Synopsys"). Since the patents issued, Intrinsic ID has been aware of the Asserted Patents, and in fact claimed in the past without basis that it was entitled to either ownership or licensing rights in the Asserted Patents.

48.     Based upon its research to date, MIT is not aware of any PUF technology provider on the marketplace that does not use at least one of Professor Devadas' revolutionary inventions for the reliable generation of the same unique signal from a PUF.

**INTRINSIC ID AND SYNOPSYS**

49.     Intrinsic ID was formed in 2008 as a spinout of Phillips Research, where the future founders of Intrinsic ID were investigating how to make certain systems more secure.[17]

50.     Intrinsic ID's mission statement was "to make it easy for semiconductor manufacturers and OEMs to secure their smart devices and create a connected world that can be trusted."[18]

51.     Intrinsic ID's main focus had been on commercializing physical unclonable functions for security and authentication applications in embedded systems and the Internet of Things (IoT).[19]

52.     Intrinsic ID's main product was based on using Static Random-Access Memory ("SRAM") as a PUF ("SRAM PUF Technology") and leveraging random manufacturing

---

[17] https://www.gsaglobal.org/intrinsic-id-looks-back-on-15-years-of-building-digital-trust/#:~:text=Building%20Digital%20Trust-,Intrinsic%20ID%20Looks%20Back%20on%2015%20Years%20of%20Building%20Digital,chiplets%2C%20the%20IoT%20and%20more.

[18] https://www.hannovermesse.de/apollo/hannover_messe_2023/obs/Binary/A1257469/Intrinsic%20ID%20Fact%20Sheet%202023%2002%2028.pdf.

[19] *Id.*

variations in SRAM already present in chips to generate device-unique authentication values.[20] SRAM, which is widely used in almost every modern computing device, is a type of integrated circuit that uses latching circuitry to store information.

53.    According to Intrinsic ID, the first markets to adopt Intrinsic ID's SRAM PUF Technology were government, defense and banking institutions, "but as the world became more digital, the technology has expanded to protecting sensitive data in the cloud and securing Internet of Things (IoT) devices . . . . [a]nd, as the IoT becomes increasingly integral in pivotal sectors such as automotive, industrial, critical infrastructure, healthcare, wearables, finance, smart residences, and urban environments, the task of securing these IoT devices has become both crucial and challenging and provides an ever-growing market for the Intrinsic ID solutions."[21]

54.    By 2023, Intrinsic ID claimed to be "the world's leading provider of security IP for embedded systems based on physical unclonable function or PUF technology," with their SRAM PUF Technology deployed in over 600 million devices.  It also claimed to have the "[m]ost scalable/robust PUF technology" and the "[l]argest SRAM PUF patent portfolio."[22]  That same year, Intrinsic ID's Chief Technology Officer also stated that "Intrinsic ID has been working on commercializing the use of PUF technology for security and authentication purposes longer than any other vendor.  We play a key role in making the digital world more secure in hundreds of millions of devices from smart watches to satellites.  As the need for security is everywhere, our solutions are becoming more relevant for a wider range of applications and industries."[23]

---

[20] https://www.hannovermesse.de/apollo/hannover_messe_2023/obs/Binary/A1257469/Intrinsic%20ID%20Fact%20Sheet%202023%2002%2028.pdf; https://www.synopsys.com/designware-ip/security-ip/cryptography-ip/puf.html.
[21] https://www.gsaglobal.org/intrinsic-id-looks-back-on-15-years-of-building-digital-trust/#:~:text=Building%20Digital%20Trust-,Intrinsic%20ID%20Looks%20Back%20on%2015%20Years%20of%20Building%20Digital,chiplets%2C%20the%20IoT%20and%20more.
[22] https://www.hannovermesse.de/apollo/hannover_messe_2023/obs/Binary/A1257469/Intrinsic%20ID%20Fact%20Sheet%202023%2002%2028.pdf.
[23] https://www.gsaglobal.org/intrinsic-id-looks-back-on-15-years-of-building-digital-trust/.

55.    Intrinsic ID was acquired by Synopsys in 2024.[24]

56.    Synopsys holds itself out as an intellectual property and tools provider. Its website states that it "is the world's leading provider of security IP for embedded systems based on physical unclonable function (PUF) technology."[25]

57.    Since its acquisition of Intrinsic ID, Synopsys claims that its SRAM PUF Technology "has been deployed and proven in over a billion devices certified by EMVCo, Visa, CC EAL6+, PSA, ioXt, and governments across the globe."[26]

58.    While other PUF technology exists in the marketplace, MIT is aware of no other PUF technology or product that uses SRAM other than Synopsys/Intrinsic ID's PUF product and technology.

59.    Synopsys has repeatedly extolled the value its SRAM PUF Technology plays in safeguarding modern electronic devices, as shown in the following statements:

- "PUF technology plays a critical role in creating a chain of trust, allowing a connected device to defend against hacking attempts by securing and storing cryptographic keys or generating keys for secure communication. In this way, PUF technology helps build the strongest possible security architecture."[27]

- "PUF-based solutions have become essential for protecting electronics from copying, hacking, and counterfeiting. … As the industry increasingly prioritizes security, PUF based technologies will continue to play a pivotal role in

---

[24] https://news.synopsys.com/2024-03-20-Synopsys-Expands-Semiconductor-IP-Portfolio-With-Acquisition-of-Intrinsic-ID.
[25] https://www.synopsys.com/designware-ip/security-ip/cryptography-ip/puf.html.
[26] *Id.*
[27] https://www.rambus.com/blogs/ask-the-expertspuf-based-security/.

safeguarding electronic devices against unauthorized access, counterfeiting … and hacking…."[28]

- "In our increasingly connected world, chip designers are integrating PUF technology in their SoCs for many applications, including identification and the creation of a product ID for track and trace."[29]

- "Synopsys is at the forefront of providing cutting-edge security solutions, including SRAM PUF technology. By integrating SRAM PUF into its suite of security products, Synopsys ensures that devices and systems are protected with the highest level of security."[30]

### SYNOPSYS' SRAM PUF TECHNOLOGY

60.     Synopsys claims that its SRAM PUF Technology "provides an additional level of hardware security by utilizing the inherent uniqueness of each and every silicon chip. The IP can be delivered as IP or software and applied easily to almost any chip – from tiny microcontrollers to high-performance FPGAs – and at any stage of a product's lifecycle. It is an important component for a hardware root of trust to validate payment systems, secure connectivity, authenticate sensors, and protect sensitive government and aerospace data and systems."[31]

61.     The Synopsys website explains that its SRAM PUF Technology "operates by leveraging the inherent physical properties of SRAM cells. When a SRAM cell is powered on, it spontaneously settles into one of two stable states (0 or 1). The specific state it settles into is determined by minute variations in the manufacturing process, which are unique to each individual

---

[28] https://promwad.com/news/physical-unclonable-functions-electronicssecurity.
[29] https://www.prnewswire.com/news-releases/synopsys-expands-semiconductor-ip-portfolio-with-acquisition-of-intrinsic-id-302093438.html.
[30] https://www.synopsys.com/glossary/what-is-sram-puf.html.
[31] https://www.synopsys.com/designware-ip/securityip/cryptography-ip/puf.html.

cell. These variations are random and cannot be replicated, even if the manufacturing process is identical."[32] The SRAM PUF Technology then uses these unique variations to "generate unique cryptographic keys," which "makes SRAM PUF a highly secure method for protecting sensitive data and ensuring the authenticity of devices in various applications, from IoT devices to secure banking systems."[33]

62.    Synopsys offers its SRAM PUF Technology to customers in a number of ways. Synopsys offers SRAM PUF Technology as part of its complete security solutions.[34] Synopsys also offers its SRAM PUF Technology as standalone hardware or software that can be integrated into computer chips made by its customers.[35] Computer chips are typically manufactured at a foundry. One key feature of the SRAM PUF Technology is that it is foundry-agnostic, meaning it can be incorporated into customers' chips made at any foundry.[36]

63.    In a joint Webinar presented by Synopsys and one of customers, GOWIN Semiconductor Corp., Synopsys explained that its SRAM PUF Technology can be used to generate cryptographic keys at any point in the supply chain by simply running an algorithm, thus no additional security hardware is needed.[37]

64.    Synopsys' customers infringe claims 1-12 of the '569 Patent and 1-11, 20 and 22-26 of the '103 Patent when they use the Synopsys SRAM PUF Technology in their systems.

65.    Claims 1-12 of the '569 Patent generally claim the generation of a cryptographic key using a key generation function and an input that includes a PUF response.  The cryptographic key is used to perform a cryptographic function (i.e., encrypting or decrypting) on data stored in

---

[32] https://www.synopsys.com/glossary/what-is-sram-puf.html.
[33] *Id.*
[34] *Id.*
[35] https://www.synopsys.com/designware-ip/security-ip/cryptography-ip/puf.html.
[36] *Id.*
[37] https://www.youtube.com/watch?v=8bmp3WH2CdM&t=19s at 14:30.

the chip.  Further, this process does not require storage of the cryptographic key in memory; it is regenerated as needed.  Synopsys' customers perform every step of the methods claimed in claims 1-12 of the '569 Patent by using the SRAM PUF Technology.

66.    As shown below, the SRAM PUF Technology's "cryptographic key" is the secret key generated from the PUF response, and the "key generation function" is the PUF algorithm that includes privacy amplification of the PUF response.  The input for generating that key is the PUF response.  Finally, the "cryptographic function" on information stored on the chip includes (a-)symmetric cryptography, secure key storage, authentication, and other cryptographic functions enabled by the cryptographic key.

## Privacy Amplification and Security

Secret keys provide security based on the fact that they are completely random and hence unpredictable. Physical measurements, such as PUF responses, have a high degree of randomness, but are usually not completely uniformly random. Privacy amplification is used to generate uniformly random keys.

By combining error correction and privacy amplification, a 1kByte SRAM PUF response can be turned into a 256-bit uniformly random key, only approximately 0.5 kByte of SRAM PUF response data is needed for a 128-bit key with full randomness. A typical SRAM PUF contains so much entropy that only a few dozen bytes are needed to provide a collision-free, globally unique identifier that can be used as a unique (but noisy) electronic chip ID (ECID) or as a serial number. [38]

---

[38]https://data.embeddedcomputing.com/uploads/articles/whitepapers/14491.pdf at p.4.

20



39



Figure 2: Enrollment and reconstruction phase for the generation of PUF keys. Note that R is the initial PUF response during enrollment while R' is a PUF response in the field with a noise component.

40

67.     As shown above, Synopsys uses error correction and privacy amplification to generate a secret (cryptographic) key using a PUF response. This process is described as the generation of a PUF response ("Silicon Fingerprint") that is "turned into a secret key."

68.     As shown above and below, the SRAM PUF key is the "cryptographic key" generated using the PUF Algorithm (the "key generator") that includes privacy amplification of the PUF response. The "input to the key generation function" is the PUF response.

---

[39]https://www.hannovermesse.de/apollo/hannover_messe_2023/obs/Binary/A1257469/Intrinsic%20ID%20Fact%20Sheet%202023%2002%2028.pdf at p.2.
[40]https://data.embeddedcomputing.com/uploads/articles/whitepapers/14491.pdf at p.4.

## SRAM PUF Implementation – BK Software & QuiddiKey

Intrinsic ID has bundled the above error correction, randomness extraction, security countermeasures and anti-aging techniques into its products. They extract cryptographic keys from the SRAM PUF in a very secure manner and are available as hardware IP (netlist) called QuiddiKey®, firmware (ANSI C Code) called BK™, or a combination of these. Hybrid solutions, combining hardware and software, offer great efficiency when already integrated hardware accelerators, such as for (a-)symmetric cryptography, are used in combination with SRAM PUF technology. [41]

### Featured Products

#### QuiddiKey® Hardware IP

Hardware root-of-trust IP which allows chip designers to create, wrap and manage keys based on SRAM PUF. This NIST-compliant IP core has earned its stripes from massive volume IoT deployments to high security payment systems and aerospace & defense applications. [42]

---

[41] https://data.embeddedcomputing.com/uploads/articles/whitepapers/14491.pdf at p.5.
[42] https://www.hannovermesse.de/apollo/hannover_messe_2023/obs/Binary/A1257469/Intrinsic%20ID%20Fact%20Sheet%202023%2002%2028.pdf at p.2.

**Use Cases**

- Secure Key Storage
- Authentication
- Flexible Key Provisioning
- Anti-counterfeiting
- IP Binding
- Supply Chain Protection

**Operating Specifications**

- 256- or 128-bit key entropy
- Highly reliable in a wide range of operational environments and across all foundries and process node
- Lifetime > 25 years

[43]

69.     Synopsys' SRAM PUF key is used to perform various "cryptographic" or "data access" functions on information stored on the chip in the form of (a-)symmetric cryptography, secure key storage, authentication, etc.

70.     As shown below, "keys that are derived from the SRAM PUF are not stored 'on the chip' but they are extracted 'from the chip,' only when they are needed":

> Keys that are derived from the SRAM PUF are not stored 'on the chip' but they are extracted 'from the chip,' only when they are needed. In this way they are only present in the chip during a very short time window. When the SRAM is not powered there is no key present on the chip, which makes the solution very secure. [44]

---

[43]https://www.hannovermesse.de/apollo/hannover_messe_2023/obs/Binary/A1257469/Intrinsic%20ID%20Fact%20Sheet%202023%2002%2028.pdf at p.2.
[44]https://data.embeddedcomputing.com/uploads/articles/whitepapers/14491.pdf at p.2.



45

71.    A detailed infringement analysis demonstrating how Microsoft's use of Synopsys' SRAM PUF Technology practices each and every limitation of claims 1-12 of the '569 Patent, either literally or under the doctrine of equivalents, is provided in **Exhibit C**.

72.    Claims 1-11, 20 and 22-26 of the '103 Patent describe a process for consistently regenerating a PUF response (e.g., when authenticating a circuit or generating a cryptographic key) for a device by using an error correction value that is based on the PUF response. The PUF response is generated by inputting an input value to a PUF component of the device and the error correction value is generated from the PUF response. Synopsys' customers perform every step of the methods claimed in claims 1-11, 20 and 22-26 of the '103 Patent by using the SRAM PUF Technology.

---

[45] https://www.youtube.com/watch?v=8bmp3WH2CdM&t=19s at 10:40.

73.     As shown below, the PUF response is the output of the SRAM PUF when powered on.  The error correction value is the activation code (AC), and the input value is the power signal or value applied to the SRAM PUF to generate the PUF response.  The PUF response is generated from the input value because the SRAM PUF generates the PUF response during the power on sequence, and the error correction value is generated from the PUF response during enrollment of the SRAM PUF to ensure that the PUF response can be reliably reconstructed.

## Error Correction

Error correction techniques for cryptographic key reconstruction require an enrollment phase and a reconstruction phase. In the enrollment phase (a one-time process) the PUF response is mapped onto a codeword of an error-correcting code. Information about the mapping is stored in an activation code (AC), sometimes called "helper data." The AC is constructed such that it does not reveal any information about the key. It should be stored in memory that is accessible by the PUF algorithms, but it can be stored off-chip as it is not sensitive. Any change to the AC, malicious or not, will prevent key reconstruction. Because the AC is created from a device-unique PUF response, the AC is only valid for the chip on which it was created.

[46]



[47]

74.     As shown below, Synopsys' literature describes generating a unique value that is a device-specific function using SRAM.  This is the claimed "first value" that is "generated as an

---

[46]https://data.embeddedcomputing.com/uploads/articles/whitepapers/14491.pdf at p.3.
[47]https://www.hannovermesse.de/apollo/hannover_messe_2023/obs/Binary/A1257469/Intrinsic%20ID%20Fact%20 Sheet%202023%2002%2028.pdf at p.2.

output of a first component." This unique value is generated each time the SRAM PUF is powered on. In order for the SRAM PUF Technology to generate its unique value, it must be provided with some input signal or value that powers on the SRAM PUF. That is the claimed "input value."

> An SRAM PUF response is a noisy fingerprint, and turning it into a high-quality and secure key vault requires further processing. This is done with the Intrinsic ID IP. It reliably reconstructs the same cryptographic key under all environmental circumstances. This (PUF) key is never stored in NVM or OTP. When it is needed, it can be reliably reconstructed. [48]

75.     As shown below, Synopsys generates an error correcting code from the PUF response to resolve the noise-based issues when processing subsequent PUF responses for the same chip. This is the "error correction value" computed from the "first value." The error correcting code is stored as "activation code (AC)."



Figure 2: Enrollment and reconstruction phase for the generation of PUF keys. Note that R is the initial PUF response during enrollment while R' is a PUF response in the field with a noise component. [49]

Using the error correcting value ("activation code (AC)") and a noisy PUF response ("output of the first component"), Synopsys reconstructs the PUF response. This is the claimed "regenerating" of the "first value."

---

[48] *Id.*
[49] *Id.* at p.4.

76.     A detailed infringement analysis demonstrating how Microsoft's use of the Synopsys SRAM PUF Technology practices each and every limitation of claims 9-11 of the '103 Patent, either literally or under the doctrine of equivalents, is provided in **Exhibit D**.

## MICROSOFT USES SYNOPSYS' SRAM PUF TECHNOLOGY

77.     Microsoft uses PUF technology to secure its cloud services. For instance, a Microsoft research article from 2020, entitled "A novel device-specific identifier based on unique hardware fingerprints," describes the use of PUF technology in a device called Azure Sphere. It states that "Microsoft recently developed a novel and secure IoT device called Azure Sphere, which has a hardware root of trust component and an additional silica to generate device-specific PUF."[50]  It also states that "we leverage the inherent process variation in manufacturing of the component to derive a PUF."[51]

78.     Additionally, Microsoft uses PUF technology in Project Cerberus, which is Microsoft's open-source hardware root of trust specification for server platforms, developed under the Open Compute Project (OCP).[52]   Architectural presentations from Microsoft's Azure Hardware Infrastructure team describe the internal design of the Cerberus Controller, which is a dedicated security chip used in server environments.  Both block diagrams and accompanying textual descriptions identify "Hardware Physically Unclonable Function (PUF)" as a core security primitive within the controller architecture.[53]

---

[50] *See* Exhibit E at 1.
[51] *Id.* at 2.
[52] https://learn.microsoft.com/en-us/azure/security/fundamentals/project-cerberus.
[53] *See* Exhibit F at 9.



# Project Cerberus Controller

Dedicated security microprocessor
- Internal secure SRAM, secure Flash.

Contains crypto acceleration blocks
- SHA / AES / TRNG / PKA

One Time Programmable (OTP) memory for Key persistence

Hardware Physically Unclonable Function (PUF)

Device Identifier Composition Engine (DICE)

SPI/QSPI bit-stream filter interface

Deployed on Project Olympus platforms

| Micro Processor | AES-256 | TRNG |
| | PKA | SHA2 |
| Power & Clock Unit POR, OCS, PLL, Clock Out | SRAM PUF | OTP |
| Flash | ADC | I2C |
| SRAM | SPIFI | Temp Sensor |
| ROM | SPI/QSPI Filter | |

Microsoft    9

79.    eeNews Europe, an industry source that provides news on the global electronics market, also states that Microsoft's Azure Sphere ecosystem relies on silicon that implements PUF technology as part of its hardware root of trust, and that Microsoft's security stack (Pluton) is designed to operate in conjunction with that PUF-based hardware.[54]

---

[54] https://www.eenewseurope.com/en/nxp-changes-naming-for-i-mx-family.

28

**Next: SRAM PUF in the i.MX9 family**

The whole i.MX9 range adds the EdgeLock autonomous secure enclave with an SRAM physically unclonable function (PUF) from a third party supplier to provide the random number generation for the root of trust.

"The capabilities are similar to what we have in some of NXP devices that are already in market," she said. "It's a third party solution that relies on handler data to be stored in external memory and the SRAM PUF hardware key strength is 256 bits."

NXP has previously used the SRAM PUF from Intrinsic-ID in Eindhoven, starting with the SmartMX in 2016.

"Since it is now part of NXP EdgeLock secure enclave, NXP will provide specific APIs to make PUF accessible to our customers," she said.

EdgeLock includes Microsoft's Pluton security software to provide connection to the Azure Sphere IoT cloud.

80.    In implementing its PUF technology, Microsoft is at least using Synopsys' SRAM PUF Technology in its cloud services, including in its data centers and point of presence locations in this District.  For instance, the same industry source above states that NXP's i.MX9 processors, which are Azure Sphere–certified, include an EdgeLock secure enclave with "an SRAM physically unclonable function (PUF) from a third party supplier."[55]  Microsoft's own website states that "Microsoft has worked alongside NXP to enable Windows IoT Enterprise support for NXP's i.MX 8 and i.MX 9 series of Arm64 processors."[56]  MIT is aware of no other PUF technology or product that uses SRAM other than Synopsys/Intrinsic ID's PUF product and technology.  NXP's public positioning as a customer and strategic partner of Synopsys (Intrinsic ID) further supports the conclusion that the PUF technology implemented in this platform implements Synopsys/Intrinsic ID's SRAM PUF Technology.[57]

---

[55] *Id.*
[56] https://learn.microsoft.com/en-us/windows/iot/iot-enterprise/arm64/nxp.
[57] https://www.nxp.com/webapp/connect/displayPartnerProfile.sp?partnerId=15200;
https://www.synopsys.com/success-stories/nxp-accelerates-automotive-software-and-processor-design.html.

81.    Also, Intrinsic ID announced in 2017 that its Spartan Cloud solution uses SRAM PUF Technology as part of an embedded security software offering for IoT devices.  The announcement states that Spartan Cloud was intended to enable IoT devices to establish security with Microsoft, among other major cloud platforms.[58]

82.    Further, Microsoft, together with others, announced leadership in 2024 of the Caliptra project, an open-source "Silicon Root of Trust" for data centers.[59]  Microsoft's Azure blog states, in introducing Caliptra, that "Caliptra is a hardware root of trust that plays a critical role in securing devices. It anchors the chain of trust directly in silicon, establishing foundational security properties that support the integrity of higher-level features."  That same website also states that "[h]ardware Root-of-Trust (RoT) devices ... are the cornerstone for establishing foundational trust on hardware components in our cloud.  This ensures the authenticity and integrity of these components and their firmware with traceability all the way back to silicon manufacturing."[60] Synopsys/Intrinsic ID is supplying the PUF technology used in the Caliptra project, as reflected in a 2024 YouTube video showing the former CEO of Intrinsic ID and present Executive Director of Engineering at Synopsys, Pim Tuyls, giving a presentation on Synopsys' SRAM PUF Technology in connection with the Caliptra project.[61]

**COUNT I: DIRECT INFRINGEMENT OF CLAIMS 1-12 OF THE '569 PATENT**

83.    MIT incorporates by reference each of the above paragraphs as if fully restated herein.

---

[58] https://www.design-reuse-embedded.com/news/201705161.
[59] https://cloud.google.com/blog/topics/systems/google-security-innovation-at-the-ocp-regional-summit.
[60] https://azure.microsoft.com/en-us/blog/protecting-azure-infrastructure-from-silicon-to-systems/#:~:text=Hardware%20Security%20Transparency,Microsoft%20conducted%20these%20reviews%20internally.
[61] https://www.youtube.com/watch?v=yFPATxD04_o.

84.     As discussed above, Microsoft uses SRAM PUF Technology in its cloud network, including, on information and belief, at its data centers and point of presence locations in this District.

85.     Microsoft's use of the SRAM PUF Technology within the United States has directly infringed under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, one or more of claims 1-12 of the '569 Patent.

86.     MIT has also reviewed all third-party PUF products on the market and found that each of them infringes the '569 Patent. Thus, to the extent that Microsoft is using PUF solutions from suppliers other than Synopsys, Microsoft still infringes the '569 Patent.

87.     As a result of Microsoft's direct infringement of the '569 Patent, MIT has suffered monetary damages and seeks recovery in an amount adequate to compensate it for Microsoft's infringement.

### COUNT II: DIRECT INFRINGEMENT OF CLAIMS 1-11 AND 20-26 OF THE '103 PATENT

88.     MIT incorporates by reference each of the above paragraphs as if fully restated herein.

89.     As discussed above, Microsoft uses the SRAM PUF Technology in its cloud network, including, on information and belief, at its data centers and point of presence locations in this District.

90.     Microsoft's use of the SRAM PUF Technology within the United States has directly infringed under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, one or more of claims 1-11, 20 and 22-26 of the '103 Patent.

91.     MIT has also reviewed all third-party PUF products that include error correction on the market and found that each of them infringes the '103 Patent. Thus, to the extent that Microsoft

31

is using PUF solutions that include error correction from suppliers other than Synopsys, Microsoft still infringes the '103 Patent.

92.     As a result of Microsoft's direct infringement of the '103 Patent, MIT has suffered monetary damages and seeks recovery in an amount adequate to compensate it for Microsoft's infringement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MIT respectfully requests the following relief:

A.     A judgment in favor of MIT that Microsoft has infringed, literally and/or under the doctrine of equivalents, each of the Asserted Patents;

B.     An award of damages resulting from Microsoft's acts of infringement in accordance with 35 U.S.C. § 284;

C.     An accounting of damages incurred by MIT from six years prior to the date this lawsuit was filed through, as appropriate, the entry of a final, non-appealable judgment;

D.     Award pre- and post-judgment interest on such damages to MIT;

E.     Any and all other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

MIT respectfully requests a trial by jury on all issues triable thereby.

Dated: May 15, 2026

Respectfully submitted,


/s/ *Kevin L. Burgess*
Kevin L. Burgess
TX Bar No.: 24006927
Email: kburgess@mckoolsmith.com
**MCKOOL SMITH PC**
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: 903-923-9003
Facsimile: 903-923-9099

Stone A. Martin
TX Bar No.: 24143713
Email: smartin@mckoolsmith.com
**MCKOOL SMITH PC**
303 Colorado Street, Suite 2100
Austin, TX 78701
Telephone: 512-692-8700
Facsimile: 512-692-8744

Joshua C. Krumholz (*Pro hac vice pending*)
MA Bar No.: 552573
Email: joshua.krumholz@hklaw.com
Jacob K. Baron
MA Bar No.: 652568
Email: jacob.baron@hklaw.com
**HOLLAND & KNIGHT LLP**
10 Saint James Avenue; 11th Floor
Boston, MA 02116
Telephone: 617-523-2700
Facsimile: 617-523-6850

Ji Mao (*Pro hac vice pending*)
NY Bar No.: 5615117
Email: ji.mao@hklaw.com
**HOLLAND & KNIGHT LLP**
787 Seventh Avenue; 31st Floor
New York, NY 10019
Telephone: 212-513-3200
Facsimile: 212-385-9010

***Attorneys for Plaintiff Massachusetts
Institute of Technology***

33